314-0065, Blair Minton, Larry Python, Miscellany Group, LLC, and the GFP Holdings, LLC, Appellants, by Benjamin Buechel, v. State, Illinois Property Tax, Appeal Board, et al., Appellee, by Valerie Quillen. Is it me, Mr. Buechel? Should I approach? Yes, sir. May it please the Court. Opposing counsel. My name is Benjamin Buechel, and I represent the developers Blair Minton, Larry Python, Miscellany Group, LLC, and GFP Holdings, LLC, in this matter. Your Honors, this is a case which deals with the proper interpretation of a number of interrelated statutes which are all intended to grant relief to Illinois taxpayers. It arises from a protest of assessments for the 2009 tax year for real property in Rock Island County, Illinois, which were appealed from the Board of Review for Rock Island to the Illinois Property Tax Appeal Board to the Circuit Court for the 14th Judicial District, and now this Court. The question ultimately today to be decided before this Court is whether the developer's exemption contained in 35 ILCS Section 1031 should apply to the present case. Alternatively, we would argue that Section 1030 should apply and that our clients are in fact entitled to the developer's exemption. Alternatively, we would argue that an appraisal submitted in this matter by our clients prepared by Mr. David Mark Nelson should in fact be upheld by this Court as not insufficient as a matter of law and more credible than those appraisals submitted by the Board of Review. I'd like to start my discussion by discussing Section 1031. 1031 is a temporary developer's exemption which was enacted in August of 2009 to provide additional relief to developers as a result of the depressed economy in 2009 and 11. Section 1031 was a more expansive developer's exemption than the original developer's exemption passed in 1977 in Section 1030. It removed a disqualification where if a parcel has undergone what is called an initial sale, that sale will automatically disqualify it from the developer's exemption under Section 1030. Under Section 1031, it will not disqualify it. We submit that under Section 1031, our clients are entitled to the developer's exemption. This is because it was enacted in the middle of the year without reference to assessments, without reference to anything other than it is to be immediately effective as of the date it was enacted. Therefore, it applies as of the 2009 tax year and it applies to 2009 tax assessments. Our argument is supported by the Mill Creek decision which... Let me just, if I could just say, so in the European position, 1031, does it affect the assessment or how the assessment is treated? It affects how the assessment is treated. 1031 and 1030 both lock assessments in at a prior value. So essentially, what the developers exempt, it's not truly an exemption from taxes per se. It is, it's more of preferential treatments. Assessments will not rise until such time as a property has been offered for initial sale or development has occurred thereon, depending on which statute you're looking at. The assessment, and of course this is what this is all about, right? The bottom line is January 1 is one property that is assessed value. That's correct. If you've got vacant land and you build a $5 million home on it January 5th, if it's vacant on January 1, for that tax year it's treated as an empty lot. That's true. That's where the law changes in the middle of the tax year. Certainly it's at best a deprivation of due process because while assessments are made at the beginning of the tax year, they are not actually published until September. Therefore, we have no ability to even know what the assessments are, much less contest them until much later in the year. And by the time we were able to contest those, 1031 had already been enacted and by its own terms was enacted immediately. So at best this is a due process violation. At worst it's a frustration of the clear intent of the legislature, which it states in the law this is to be effective immediately. It does not state that it is effective as of assessments for January of 2010. It states it is effective immediately. To us that's clear that the legislature intended for 1031 to be applicable to 2009 assessments. Well, I suppose everybody that owned real property in 2009 thought they were denied due process. I mean, it was because of what happened to property values in 2009. No, absolutely. And I would agree with that. The statute was enacted to give additional protections to developers as a result of the depressed economy in those years. And these developers were, if you were sitting on a lot of planted land, you really had a problem in 2009. No, absolutely. Absolutely. And that's part of the reason that's why we're here today. It's because the original developer couldn't obtain financing. So as a result, we enacted a plan of restructuring and refinancing, which resulted in the transactions that are ultimately at issue here today. As I was saying, in Mill Creek, which appellants cite in their brief, a mid-year exemption statute will apply when at the moment its conditions are satisfied. Our clients, the conditions for 1031's applicability are it was planted after 1978, it was more than five acres, and it was vacant land. Each of those conditions were satisfied as of August 14, 2009, the day that 1031 was enacted. And therefore, applying the rule in Mill Creek, that the developer's exemption contains therein should apply immediately to the 2009 tax year. And as I stated before, we've already discussed the due process issues. And once again, to emphasize this point, it is clear from the legislative intent that it was intended to take effect immediately. In the last sentence of the statute, it states this statute will take effect immediately upon enactment. Other statutes do, in fact, use the term shall apply to assessments for the next tax year or apply to assessments for subsequent years. But the legislature didn't use that language. The legislature stated it would be effective immediately upon enactment. Therefore, 1031 should apply for the 2009 tax year, and our clients should be entitled to the developer's exemption for the year 2009 contained in 1031. As an alternative argument, we argue that Section 1030, which was the original developer's exemption passed by the legislature in 1977, should apply because the sale transactions at issue were not, in fact, initial sales as defined in Illinois law. Now, as I've discussed before, 1030 does contain a restriction whereby an initial sale, quote unquote, will disqualify property from the developer's exemption. Now, this sale at issue is not an initial sale. We don't have a definition of what an initial sale is within this statute. So, therefore, we would look at other parts of the code to determine what the legislature was thinking when they used the term initial sale. So we find in the Condominium Developers Act a definition of initial sale, which refers to a sale for the specific use of occupancy. The Condominium Property Act was passed in 1963, which would be, if my math is correct, 14 years prior to the developer's exemption, Section 1030. Therefore, it is clear that the legislature defines this term once in the state code. It did not feel the need to define it again. Well, let me ask you about that. In the Condominium Act, it says a sale is not an initial sale for the purposes of this section if there is not a bona fide yada, yada, yada. So, what do we make of that? I would argue that, you know, certainly for the purposes of this section is troubling language. However, these statutes are interrelated. Each of them deal with real property. Each of them, the Condominium Property Act doesn't directly deal with taxation, but it impliedly deals with taxation in certain portions. And, obviously, 1030 deals directly with taxation. We would submit that in order to read these related acts together in harmony, the term initial sale should be read, the terms in the statutes should be read in a way where they line up, where they are in harmony with each other. We would submit that under Section 1030 for initial sales, the analysis is not simply whether the sale occurred, but rather why the sale occurred. So, for an initial sale, if the sale was for specific use of occupancy, for the use of development as a commercial or residential property, then in that instance, the developer's exemption would be stripped. That's quite clear according to the statute. However, if the sale is for another purpose, such as holding it for sale, such as continuing to use it as farmland, then in that case, that sale is not in fact an initial sale for the purposes of 1030. And, therefore, the developer's exemption would still apply. And this submission is, in fact, supported by the Bond County case, which, again, we have cited in our brief. In Bond County, there was a parcel that was used as agricultural land. That piece of land was platted and subdivided by its original owner. It was sold to an individual, who then subsequently sold it to his son. The Board of Review reclassified it as residential property based on these sales. The Court of Appeals rejected the PTAS arguments that Section 1030 requires that a rise in assessments occur. Council has two minutes. Alternatively, we would move to a discussion of the appraisal. David Mark Nelson submitted an appraisal which did not include the comparative sales approach. Now, under Illinois law, comparative sales approach is preferred. However, and indeed, a single approach appraisal that excludes comparative sales is, for the purposes of Illinois law, insufficient as a matter of law. However, Mr. Nelson used two different methods of appraisal to arrive at his conclusions. It was not a single approach appraisal that excluded comparative sales. It was a multiple, in this case, two method of sales appraisal, and therefore it was not insufficient as a matter of law. In addition, these sales were bulk sales, sales of multiple lots in a bundle. In Rock Island County, there simply aren't that many comparable sales of lots in bulk for the purposes of holding them for development that might perhaps exist in other counties. This is why the Board of Review's appraisal is simply not credible here. They looked at individual lot sales for various purposes, for residential development, for commercial development, etc. Now, the standard for comparable sales has been a long standard, hasn't it? The standard evaluation has been around for a long time. Oh, absolutely. We don't deny that comparable sales is the preferred approach. Well, it is the approach, isn't it? It's not the required approach. It is not absolutely mandated. There are certain exceptions to the rule, and certainly there's case law out there which states that a single approach appraisal, which excludes comparable sales, is insufficient. But where you use multiple methods, more than one, and you do not use comparable sales, that would be not insufficient as a matter of law. And indeed, in this instance, more credible simply because the... Has that been clearly stated in the case law? It's been clearly stated that a single approach appraisal that excludes comparable sales is not sufficient. But the opposite approach you're referring to has not been... I would concede that point, but I think the implication is clear by saying a single... that does not include comparable sales may be sufficient. Let me add, in the board's appraisal, what were the dates of the sales, do you recall? There were a number... They were scattered around, I believe... They were within about a year to two years. So I don't recall the dates off the top of my head, Your Honor. But they were scattered in various points. And I think not all of them were in the middle of the depressed economy in, I suppose, the late 2008, early 2009. Well, it was really the late summer 2008, wasn't it? I believe that's... Precipitous. I believe that's right, yes. Real estate values. I believe that's right, yes. Counsel's time. May I have time to conclude? Yeah, just finish your thought and then you'll have a rebuttal. Okay, very good. Again, I think that the comparable sales used by the county, they didn't necessarily, in addition, take into account the economy during 2008, 2009, 2010, 2011. Some of them were outside of that scope and certainly weren't reflective of the market during that time. Thank you, Mr. Greenbaum. Thank you. Ms. Quinn. May it please the Court. Your Honors, in enacting Section 1030 and 1031, the General Assembly was trying to balance a policy of protecting developers, encouraging development on the one hand, against the need of counties and school districts for tax revenue on the other hand. Section 1031 was explicitly a temporary fix enacted in response to the recession. The purpose was to encourage developers to jump in during the difficult time by adding that extra incentive to get the ball rolling, temporarily removing the initial sale as a condition that would terminate the preferential treatment. And that would encourage other developers then maybe to pick up the ball and carry the ball if that first platting developer ran into difficulties and needed to sell. It was a way to just encourage people to keep the ball moving and not have empty lots sitting around. These taxpayers had the benefit of the developer's preferential treatment in 2008, and that is because the original owner, Andalusia Ventures, recorded their plat in 2007, and then the tax assessment was fixed as of January 1, 2008. Five weeks later, the property sold first to Fancy Creek LLC, and then certain individual lots to the plaintiffs in this appeal. So there were two sales. But because tax assessments are fixed on January 1st, and they don't change just because a property changed hands, these plaintiffs had the benefit of that favorable tax rate for most of 2008. Different story in 2009. It's unlikely they'd be heard to argue that their 2008 purchase should unfix their tax assessment for the 2008 tax year. Nothing that happened during 2009 should similarly unfix the tax assessment for that year. People can't have it both ways. You can't argue for something that you like one year and something that you don't like the next. These taxpayers are essentially asking this court to disregard the plain language of both statutes, and they've given the court really no reason basis to do that. As an aside, I may be mistaken, but I don't recall having heard a due process argument made before, so I would submit if it has not been made previously, it was forfeited. Throughout this case, the plaintiffs had argued that they are in the class that Section 1030 was crafted to protect. Where to draw the lines in a statute is a matter of legislative prerogative. The General Assembly knows how to craft a statute to give the benefit of tax preferential treatment or tax relief to the parties to whom it wants to give that. In this case, if the General Assembly had meant to confer the benefit of reduced tax assessments on any developer who purchases already subdivided, platted land, the legislature would have said so. They wouldn't have put that term, initial sale, in the statute because it's self-evident that property can change hands a number of times before the development is finished and before the property ends up in the hands of its end user, homeowner, occupier, whatever it may be. Well, let me just answer this. Of what import is the word effective immediately in the statute? It almost sounds like the state's position, well, it's effective January 1, 2010. They said it's effective. What's the import of being immediately effective? You're just talking about the temporary Section 1031, that temporary relief? Effective immediately. Effective immediately means going forward. The case law is clear that preferential tax treatment that's enacted mid-year does not affect that year's taxes. And we find that in Kassebaum at page 477. We find it also in Kennedy at 164. And those are just the highlights. And those involved tax relief statutes that were enacted mid-year, I think in Kennedy, was in September of 1983. And the court said, but it doesn't affect the taxes for this year. And those were statutes that did not have a temporal reach specified in them. Section 1031 specifically says this applies from August 2009 through the end of 2011. Nothing about that changed the assessment. We don't go back and unfix the assessment for the tax year. It was already fixed as of January 1. So it affected anybody who bought property, already platted property, from August of 2009 through the end of 2011. And that, as I said, is a policy of trying to not only encourage developers to get in and start the ball rolling, but for other developers to then buy that property if the first developer runs into difficulties. Property development is an uncertain game even in the best of times. Property can change hands. This was just a little bit of extra protection enacted specifically for that difficult economic period. Your Honor, my opposing counsel made reference to the Mill Creek case. That was a case where the county, in the middle of the tax year, tried to change the taxpayer's assessment. And the Property Tax Appeal Board and ultimately the appellate court said, no, you can't do that. Taxes are fixed as of January 1. You can't go back and backdate somebody's assessment. There really is nothing that allows you to do that. Now, the Condominium Property Act really has no relation to the statutes that are at issue in this case. The Condominium Property Act is found in a completely separate section of the code. It deals with various interests in property. These statutes are found in the revenue section. They're no more related to each other than either of them is, say, to the Mobile Telecommunications Sourcing Conformity Act, because that also uses the term initial sale and doesn't define it. There's no need for a definition of initial sale. It's obvious what it means. First, sale. Similarly, Your Honor, in Bond County, it really didn't involve Section 1030 at all, because in Bond County, the county assessor was trying to use Section 1030 against the property owner to raise his assessment in the middle of the year, even though he'd been farming it continuously. And the statute says that if it's being used as farmland, it has to be assessed as farmland until you meet certain conditions, which hadn't been met yet. With respect to valuation, Your Honor, their appraiser admitted that evidence as to individual lot sales existed. He just didn't use it because he was instructed to value these properties in bulk, and it's very, very difficult to find a bulk transfer out there on the market. But the evidence existed. The evidence on which PTAB based its valuation decision was ultimately correct because it considered evidence of comparable sales, which you have to consider when that evidence exists. Let me ask you this. So was there an adjustment on the taxing body's appraiser using comparable sales back? And even if you went to the spring of 2008, compared to maybe December of 2008, he used comparable sales. Was there an adjustment then later? Maybe they didn't have anything like that. How do you have comparable sales on the same kind of property and yet you had this catastrophic, which obviously it seems that General Assembly was trying to deal with in some of these sections, but just with respect to the appraisal, is it fair if you just value this or was there an adjustment made on those comparable sales in light of what had happened to property values between January 1 of 2008 and January 1 of 2009? Your Honor, the record is not clear whether the Board of Review took the economic circumstances into consideration, and unfortunately I don't have the spreadsheet with me. I can't believe I didn't have that, but I don't have it with me, so it's in the record. I can look up the page sites for the Court. The Court's probably already familiar with it. So I don't remember the exact dates of the sales. Certainly PTAB made an adjustment in its consideration because, first of all, when the plaintiffs argued that, look, some of these are not really arm's-length transactions because they're the properties that our clients purchased, PTAB took those out of consideration. And then it made adjustments downward for the fact that it considered the downward adjustments based on the fact that these were bigger lots, you know, the smaller lots tend to go for a higher per-square-foot rate. So there were adjustments made. I don't recall specifically from the record that there were any adjustments made for the economic conditions. If the Court wishes, I could submit. No, that's fine. It's in there. It's a big record, Your Honor. Yeah. As this Court has explained in Kankakee County, the Armstrong case, the Property Tax Appeal Board's role in evaluating evidence and credibility is unique. A mere difference of opinion as to value is not sufficient for reversal. And here the final administrative decision on value was well supported by the evidence in that record because PTAB had not only the Board of Review's live testimony by Mr. Wilson, it had that spreadsheet of comparable sales. And kind of as a nice check on the Board of Review's evidences to value, the record also contains an appraisal of Larry Python's empty lot. And that was performed by a private appraisal firm, Kostner & McGivern. The firm's appraisal is at C911 of the record. I got that right in my statement of facts, and I miscited it as 915 in the argument because there's handwriting over the base stamp, and I looked at it quickly. It's at 911 of the record. And the value for this site is right under the words Uniform Residential Appraisal Report. The Kostner & McGivern appraisal valued the lot, at $380,000, which is actually higher than the Board of Review's estimate, which is $377,000. So that tells us that the Board of Review was pretty much on target in its estimation of value. And with this sort of evidence before it, it really cannot be said that the PTAB's findings as to fair market value were against the manifest weight of the evidence. You know, sometimes manifest weight is talked about as something, you know, no rational fact finder could have come out the same way as this fact finder did. That's certainly not the case here. Taxpayers argue that they did a full cost approach. They didn't, and their appraiser explicitly admitted that he didn't. He sort of waved his hand in the direction of it, but basically his valuation approach was this hybridized income stream method. That's pretty much only one method. I mean, if the Cubs and the Sox get together, play two innings, and go home, it's not a baseball game. If you haven't done a full cost approach, then you haven't done two methods of valuation. And, of course, there is no sales comparison. Unless the Court has further questions for me, then for all these reasons and for the reasons stated in Arif, Your Honors, we would ask that this Court affirm PTAB's final administrative decision. Thank you. Mr. Beasles in rebuttal. Yes, Your Honor. I think I'd like to begin by addressing my opposing counsel's contention regarding Casabon in that the statutes that were issued in Casabon, and I don't have the case in front of me, but I believe that statute stated that it is applicable to assessments after a specific date. That's my memory of what the statute stated. Now, for 1031, that's a different statement in 1031. This statute is effective immediately. It does not say anything about which assessments it's applicable to. It does not say anything about when prospectively it is to be effective. It states it is effective immediately. To me, certainly, immediately means immediately. It means right now, today, as of this tax year, not down the road in 2010. With regards to the due process arguments, I don't think we phrased it as it's a due process argument in the brief, but I do think I, but we did make mention of the fact that it is, in fact, fundamentally unfair. Well, let's talk about that just a minute. Because if you have a, like you said, you've never even seen your tax assessment, right? And then if you come later and if you protest that assessment and get it revised, that revision goes back to January 1 of the prior year. That's the assessment that gets changed, right? Right. So you're not denied the opportunity to attack that assessment. I never met anybody who liked the tax assessment. Well, I mean. You know what I'm saying? So, I mean, this is due process argument really holding water because if you get the, when the tax bill finally does come out or you receive notice of your assessment, then you can file your protest and that protest is retroactive to January 1 of the taxing year. I would concede the point that, you know, that PTAS interpretation of the statute does not, in fact, deprive us of our ability to protest the taxes. However, it deprives us of the application of the statute, which would clearly grant us the developer's exemption. And to that extent, it is, you know, it is a deprivation of, you know, at the minimum rights conferred in the statute. You know, and certainly. The issue here is what right, what we got to say is what rights were conferred in that statute when they became effective. Right. The particular transaction. And I, yeah, I would agree. That is the essential issue before this court is, you know, what rights were conferred as of August 14, 2009. You know, was 1031 retroactive, was 1031, in fact, retroactively applicable? We submit that it was. With regards to the Barnes County case, opposing counsel contends that that didn't really involve Section 1030. Well, frankly, Your Honors, it did. They cite 1030 repeatedly. PTAS argument was that 1030, that application of 1030 generates a higher assessment value for agricultural farmland that has been previously platted. In fact, a reading of the statute says that, you know, the conditions are as it's platted and subdivided after 1978. At the time of planting, the property is in excess of five acres. At the time of planting, the property is vacant or used as a farm. 1030 would apply to that. And because it was then sold after it was platted, PTAS argued there that Section 1030 should apply to strip away essentially what essentially was the developer's exemption. And Barnes County absolutely rejected that argument. They stated 965 and 1030, when read together, do not compel an increased assessment. With regard to the appraisal, we do agree that, you know, the Board of Review's conclusions are, I suppose, unique, that they are, you know, they are what they are. However, the review before this court is de novo review. Therefore, lower court decisions, administrative bond decisions, are not entitled to deference or weight by this court. The court can look at the records and determine what it's, you know, determine what is correct and what is not correct. PTAB has its own opinions. The circuit court has its own opinions. But this court is the ultimate arbiter of what the law is. Counsel has one minute. And with regards to opposing counsel's comments as to the hybridized approach, we did, you know, Mr. Nelson did in fact take two approaches. He ultimately combines them into one approach. You know, but the fact is he utilized two approaches. What he did with them ultimately is not of particular, we would contend it's not of particular relevance to the analysis of whether he used more than one approach to come to his conclusions. He did indeed use more than one approach. You know, he used two different approaches, hybridized them, and he arrives at a conclusion as to his appraisal. And to conclude for the foregoing reasons, we would request that this court reverse and remand the PTAB, the district court, and the board of review with instructions to alternatively apply 1031, 1030, or review the appraisal as sufficient as a matter of law. Thank you, Your Honors. Thank you, Mr. Briegel. Ms. Quinn, thank you. This matter will be taken under advisement. This position will be issued. And right now, we'll be in what we hope will be a brief recess until the panel changes to the next page.